Hubert C. LAWRENCE,
et al., Plaintiffs,

v.

TOWN OF IRONDEQUOIT,
et al., Defendants.

No. 01–CV–6306L.

United States District Court,
W.D. New York.

Oct. 29, 2002.

J. Nelson Thomas, Dolin, Thomas & Solomon LLP, Rochester, NY, for Plaintiffs.

Lisa T. Sofferin, Brown & Kelly, Buffalo, NY, for Defendants.

## DECISION AND ORDER

LARIMER, Chief Judge.

### INTRODUCTION

Plaintiffs Hubert Lawrence, Amelia Fontana, Roger Fox, and John Magin ("plaintiffs"), four retired Town of Irondequoit employees, commenced this action on behalf of themselves and a proposed class of similarly situated retired Town employees against defendants, the Town of Irondequoit, Sharon Burke (the Town of Irondequoit Director of Human Resources), and David Schantz (Town Supervisor) (collectively referred to as "the Town"), asserting claims based on 42 U.S.C. § 1983, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, New York Human Rights Law § 296

("NYSHR"), Article 5, Section 7 of the New York State Constitution, and various state common law theories, including breach of contract, fraud, and misrepresentation.

In brief, plaintiffs claim that the Town wrongfully reduced their retirement health care benefits from Blue Cross/Blue Shield's "Blue Million Plan" to a less costly Blue Choice Plan, effective July 1, 2001. Plaintiffs contend the Town's 1978 Personnel Policies and Procedures Manual (the "1978 Manual") created a contract between plaintiffs and the Town that assured plaintiffs lifetime Blue Million coverage if, at the time of retirement, they had been employed on a regular basis by the Town for a minimum of ten years and were fifty-five years old or more upon retirement. There is no dispute that plaintiffs all met those pre-conditions.

According to plaintiffs, the provisions of the 1978 Manual precluded the Town from changing those benefits once plaintiffs retired and met both conditions. Plaintiffs also assert that they had a constitutionally protected property right in the lifetime Blue Million coverage promised by the Town which was abrogated without due process of law, and that the Town's new resolution regarding retiree health care benefits is discriminatory on its face in violation of the ADEA insofar as it conditions participation in one of three new plans solely on the age of the retiree.

The Town asserts it was not barred from changing plaintiffs' health care coverage as it did, that the 1978 Manual did not constitute a contract between the Town and plaintiffs, and to the extent the Town had any obligation to provide health care coverage to plaintiffs, it fulfilled that obligation in accordance with the terms of the 1978 Manual by continuing to provide "Blue Cross/Blue Shield" coverage to plaintiffs.

Plaintiffs now move for class certification, pursuant to FED. R. CIV. P. 23, and for partial summary judgment, pursuant to FED. R. CIV. P. 56. The Town opposes class certification and cross-moves for summary judgment seeking dismissal of all of plaintiffs' claims, or in the alternative, dismissal on the merits of plaintiffs' federal claims, and dismissal for lack of subject matter jurisdiction on the state law claims.

## FACTUAL BACKGROUND

In 1967, the Town passed a resolution by which it agreed to pay the entire premium for Blue Cross/Blue Shield coverage for all future retired employees who retired at the age of 60. In about 1970, these practices were codified into a personnel manual which set forth all of the Town's personnel policies.

There were some changes during the 70's and finally in September 1978, the Town published an updated manual ("1978 Manual") which is at the heart of this litigation. Plaintiffs, who are all retirees from the Town, contend that the health insurance benefits set forth in the 1978 Manual provided them with lifetime coverage.

### A. The 1978 Manual

The 1978 Manual was adopted by resolution of the Town Board on September 21, 1978. Dkt. # 18, Ex. B.

According to the preamble of the 1978 Manual,

[t]he updated policies and practices contained in this Manual comprise the "Code of Personnel Relations of the Town of Irondequoit". It is the purpose of this Manual to codify personnel policies and practices that will provide fair and consistent treatment of employees of the Town, and provide each Department Head a guide to uniform interpre-

tation and application of the policies and practices involved. In addition, the Manual is intended to be the primary means by which employees of the Town are informed of their benefits, rights, and responsibilities, as well as the rules and procedures which govern the personnel relationships between the Town and its employees.

Dkt. # 29, Ex. E.

Page V–5 of the 1978 Manual, entitled "Hospitalization—Retired Employees", provided:

[i]t is the policy of the Town of Irondequoit to pay the cost of Blue Cross/Blue Shield coverage for all Town employees who, at the time of retirement, had been employed on a regular basis as a Town employee for a minimum of ten (10) years and had reached fifty-five (55) years of age or older. Retirement is understood to mean retiree has qualified for New York State Retirement Benefits under the New York State Retirement System and has received at least one (1) retirement benefit check.

Dkt. # 29, Ex. E, at V–5, ¶ 1; *see also* ¶ 10. The stated purpose of the policy was "[t]o establish uniform practices with respect to Town payment of Blue Cross/Blue Shield coverage for retired Town employees." *Id.* at ¶ 5.

The 1978 Manual did not define "Blue Cross/Blue Shield coverage." However, the provision related to health care benefits for active Town employees provided that the Town was to pay full premium for all employees to participate in the " 'Blue Million Preferred Plan' of Blue Cross and Blue Shield," which provided more comprehensive coverage than the standard Blue Cross/Blue Shield plan. Dkt. # 29, Ex. E, V–3, ¶ 15.

It is not disputed that upon retirement[1], the Town continued to pay plaintiffs' health care coverage under the Blue Million Preferred Plan. When each of the plaintiffs reached Medicare-eligibility status at the age of 65, the Town, in accordance with Blue Cross/Blue Shield policy, paid for coverage in the Blue Million Complementary Plan, a supplemental Medicare Plan. Dkt. # 43, Watro Reply Aff., ¶¶ 13–14, 27, 29. According to Beth Watro, the Town's Payroll Clerk responsible for the administration of health insurance, the conversion of health care coverage upon reaching Medicare-eligible status is orchestrated by Blue Cross/Blue Shield, and the Town's policy to provide different coverage to Medicare-eligible retirees is based solely upon the plans provided by Blue Cross/Blue Shield. Dkt. # 43, Watro Reply Aff., ¶ 27; *see also* Dkt. # 41, Sofferin Aff., Ex. A.

## B. Changes to the health care benefits offered by the Town

In the 1990's, the Town began experiencing a decline in tax revenue due to population losses and decreased sales taxes. Since 1992, however, the Town incurred a 70 percent increase in its health insurance premiums. Dkt. # 29, Schantz Aff., ¶¶ 8–15, 18. Unwilling to make cuts to police or other services, the Town began making changes to the fully paid health insurance coverage for both its active and retired employees. *Id.* at ¶¶ 21–22.

For instance, as of January 1, 1996, the Town switched fully paid coverage for ac-

---

**1.** Plaintiff Hubert Lawrence retired 1992 at the age of 59 after almost 40 years of service. Dkt. # 25, ¶ 5. Plaintiff Amelia Fontana retired in 1991 at the age of 63 after 34 years of service. Dkt. # 19, ¶ 5. Plaintiff Roger Fox retired in 1990 at the age of 56 after 30 years of service. Dkt. # 20, ¶ 5. Plaintiff John Magin retired in 1984 at the age of 55 after 32 years of service. Dkt. # 21, ¶ 5.

tive employees from the Blue Million Plan to the Blue Choice Plan, a less costly HMO plan. Dkt. # 30, ¶ 25; Dkt. # 29, Ex. L. On March 1, 1998, the Town again switched plans for active employees from Blue Choice to Blue Choice Select, an even less costly HMO plan. Dkt. # 30, ¶ 29; Dkt. # 29, Watro Aff., ¶ 18. In addition, employees who retired after January 1, 1996, who were Medicare-eligible, and had more than ten years of service, were entitled only to fully paid coverage in the Blue Choice Senior plan, with a prescription drug rider. Employees hired after January 1, 1999, were responsible for paying ten percent of their health care coverage costs. Dkt. # 29, Ex. O. Further, employees hired after January 1, 1999, were eligible for retiree health care coverage only upon completion of 20 years of service. Dkt. # 29, Ex. O and Watro Aff., ¶ 20. All of these changes had been prospective in nature and affected only newly hired or newly retired employees.

## C. Changes to plaintiffs' health care coverage

On March 20, 2001, the Town passed a resolution changing the fully paid coverage it provided to current retired employees. Dkt. # 23, Ex. A. Effective July 1, 2001, retirees previously provided fully paid Blue Million Preferred coverage (i.e. those who were retired, but had not yet attained Medicare-eligibility status at the age of 65) received fully paid coverage in Blue Choice Select, a plan less comprehensive than the Blue Million Plan. *Id.* Retirees previously provided fully paid Blue Million Complementary coverage (i.e. those who were over the age of 65) were offered fully paid coverage in Blue Choice Senior or Supplemental H, a non-HMO Medicare-supplemental plan. *Id.* However, if a retiree who had previously been provided Blue Million Complementary coverage was over the age of 80 as of July 1, 2001, his or her health

care coverage did not change. The Town continued to provide fully paid coverage in the Blue Million Complementary Plan. *Id.* Retirees wanting to continue their Blue Million Preferred or Complementary coverage could do so but only if they paid the difference in premium costs between Blue Million and Blue Choice or Supplemental H coverage. *Id.*

On March 27, the Town sent letters to all affected retirees, including plaintiffs, setting forth the changes in coverage and the opportunity to continue Blue Million coverage. *Id.* at Ex. B. Plaintiffs Lawrence and Fox elected to retain Blue Million Complementary coverage. Plaintiffs Fontana and Magin elected to receive fully paid coverage in the Blue Choice Senior plan. Dkt. # 43, Watro Reply Aff., ¶¶ 3–12.

On June 14, 2001, plaintiffs brought this action on behalf of themselves and a proposed class of thirty-three similarly situated retirees against the Town seeking reinstatement of their Blue Million Complementary coverage at no cost to them, compensatory and punitive damages, and attorneys fees. Dkt. # 1.

Plaintiffs move for partial summary judgment on their breach of contract, 42 U.S.C. § 1983, ADEA, NYSHR and New York State Constitution claims. The Town cross-moves for summary judgment principally on the breach of contract and federal claims, a § 1983 claim and the age discrimination claim, and moves to remand the state law claims to state court if the federal claims are dismissed.

## DISCUSSION

For the reasons set forth below, plaintiffs' motion for summary judgment is denied and the Town's motion for summary judgment is granted in part, and denied in part.

### 1. Summary Judgment

On a motion for summary judgment, a court's responsibility is to determine whether there are issues to be tried. *See Joyce v. Curtiss–Wright Corp.*, 171 F.3d 130, 133 (2d Cir.1999); *see also Larsen v. NMU Pension Trust*, 902 F.2d 1069, 1073 (2d Cir.1990). Summary judgment will be granted if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(C); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Larsen*, 902 F.2d at 1073. A genuine issue of material fact exists only if the record, taken as a whole, could lead a reasonable trier of fact to find in favor of the non-movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### A. Due Process Claim—42 U.S.C. § 1983

■ Plaintiffs allege they "were given no due process protections prior to the revocation of their benefits," Dkt. # 6, ¶ 30, and that "defendants violated their obligations under § 1983." *Id.* at ¶ 37. Plaintiffs base their § 1983 claim on an alleged deprivation of property without due process of law in violation of their Fourteenth Amendment rights.

For purposes of deciding this claim, I will assume without deciding that the 1978 Manual created an obligation by the Town to provide plaintiffs fully paid Blue Million coverage for life. I will also assume that benefits under the new Blue Choice and Supplemental H plans are inferior to benefits available under the Blue Million plans. Therefore, the issue to be decided is whether a reduction in health care benefits to a retired employee, whose right to receive such benefits arises from a contract and has vested, constitutes a violation of a constitutionally protected property interest that cannot be deprived without due process of law. In my view, the Constitution provides no remedy under these circumstances.

To decide this issue, the Court must determine whether (1) plaintiffs "possessed a constitutionally protected property interest (2) the deprivation of which resulted from government action (3) without constitutionally adequate pre- or post-deprivation process." *New York State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 163 (2d Cir.2001) *citing Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982).

Plaintiffs allege that they have a constitutionally protected property interest because the Blue Million coverage was meant to be permanent, that they are extremely dependent on that coverage, and they have a legitimate claim for entitlement to those benefits. Dkt. # 17 at 10. The Town asserts plaintiffs' interest in fully paid lifetime Blue Million coverage does not constitute the type of interest normally afforded constitutional protection. Dkt. # 31, pp. 4–7.

I agree with the Town that plaintiffs here do not have a constitutionally protected property interest in receiving fully paid Blue Million coverage. "Property interests protected by due process are neither created nor defined by the Constitution. 'Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Martz v. Village of Valley Stream*, 22 F.3d 26, 29 (2d Cir.1994) *quoting Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "When determining whether a

plaintiff has a claim of entitlement, we focus on the applicable statute, contract or regulation that purports to establish the benefit." *Id.* at 30, *citing Kelly Kare, Ltd. v. O'Rourke,* 930 F.2d 170, 175 (2d Cir. 1991).

In my view, plaintiffs' interest in receiving a specified level of retirement health care benefits paid for by the Town "is qualitatively different from the interests the Supreme Court has thus far viewed as 'property' entitled to procedural due process protection." *S & D Maintenance Co. v. Goldin,* 844 F.2d 962, 966 (2d Cir.1988); *see, e.g., Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (entitlement to statutory welfare benefits afforded due process protection). As the Second Circuit Court of Appeals observed in *S & D Maintenance Co.,* "the Due Process Clause is invoked to protect something more than an ordinary contractual right. Rather, procedural protection is sought in connection with a state's revocation of a *status,* an estate within the public sphere characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure, or sometimes both, as frequently occurs in the case of social security benefits." *Id.* at 966 (emphasis in original). As such, "the course of the law in this Circuit has not moved beyond according procedural due process protection to interests other than those well within the contexts illustrated by *Goldberg* and *Roth.*" *S & D Maintenance Co.,* 844 F.2d at 967.

*Costello v. Town of Fairfield,* 811 F.2d 782 (2d Cir.1987), is instructive. In *Costello,* retired police officers filed a § 1983 action against their former employer alleging that the Town improperly refused to increase their retirement benefits pursuant to a wage increase secured by a collective bargaining agreement. The Court of Appeals affirmed the District Court's dismissal of plaintiffs' § 1983 claims, distinguishing its prior decision in *Basciano v. Herkimer,* 605 F.2d 605 (2d Cir.1978):

> In *Basciano,* we held that an interest in disability retirement benefits is protected by due process. In that case, however, the plaintiff alleged that the City's procedure to determine whether he was entitled to *any* disability retirement benefits, a procedure plaintiff had exhausted, deprived him of due process. Unlike *Basciano,* appellants here have not been denied their basic retirement benefits. Appellants have been receiving their pensions and merely dispute the lack of an increase they claim is due them under the collective bargaining agreement. Indeed, before undertaking to determine if there is an entitlement to an increase herein, there first should be a resolution of the dispute concerning whether the claimed increase is due. Clearly, it is the interpretation of a contract term that is at issue here and the appellants have pursued this contract dispute in the district court under the guise of a due process violation. A contract dispute, however, does not give rise to a cause of action under section 1983.

*Costello,* 811 F.2d at 784; *see also S & D Maintenance,* 844 F.2d at 967–68 (contractor had no constitutionally protected property interest in the right to continuation of contract with City of New York; contractor's remedy "lies in state court for breach of contract"); *but see Russell v. Dunston,* 896 F.2d 664, 668–69 (2d Cir.1990) (public employee has a property right to certain disability retirement benefits based on Article V of the New York State Constitution).

Applying these same principles, the District Court in *Bell v. Westmoreland Cent. Sch. Dist.,* No. 87–CV–1592, 1991 WL 33161 (N.D.N.Y. Mar. 11, 1991), dismissed plaintiff's § 1983 claim on the grounds that

plaintiff had no constitutionally protected property interest in the continuation of post-retirement health care benefits. In *Bell*, plaintiff relied upon a provision in his employment contract that purported to establish his entitlement to those benefits. The Court held that "[t]he present case turns on the interpretation of an employment contract—nothing more; and as is *Costello* that contract dispute is not actionable under § 1983." *Id.* at *4.

Similarly here, plaintiffs do not have a constitutionally protected property interest. Furthermore, plaintiffs are in a better position than the plaintiff in *Bell* because the Town has not deprived them entirely of paid health care benefits. Like the plaintiffs in *Costello*, who did not allege a total deprivation of retirement benefits, plaintiffs here continue to receive paid health care coverage by the Town, just not at the Blue Million level. In my view, the interest in Blue Million health care coverage is not the type of interest that should be afforded constitutional due process protection. *Bell*, 1991 WL 33161, at * 3; *see also Danese v. Knox*, 827 F.Supp. 185, 193 (S.D.N.Y.1993) (right to line of duty sick leave pursuant to collective bargaining agreement is not a property right subject to due process protection because deprivation of that right did not constitute a deprivation of a status characterized by "extreme dependence" or "permanence" and would not result in the loss of livelihood).

Despite their sworn statements that plaintiffs are extremely dependent on fully paid health care coverage, the Supreme Court in *Roth* has made clear that "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of

it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577, 92 S.Ct. 2701.

Here, plaintiffs' claim of entitlement to the benefit arises out of a contract with the Town, not from a state statute or constitutional provision. *See, e.g., Russell*, 896 F.2d at 668–69 (property right based on New York State Constitution); *Basciano*, 605 F.2d at 609 (property right based on Administrative Code of City of New York). In essence, this is an ordinary contract dispute that should not be elevated to a constitutional claim. For the reasons set forth in *Costello, S & D Maintenance*, and *Bell*, this case should not be decided under § 1983. *See also Martz*, 22 F.3d at 29–31 (refusing to find constitutionally protected property interest in receipt of payment for services rendered to Village for § 1983 claim; plaintiff "simply is alleging breach of an ordinary contract"). If the Court were to elevate this claim to a constitutional dispute, it would have the effect of "surround[ing] the entire body of public contract rights with due process protections." *S & D Maintenance*, 844 F.2d at 967.

Furthermore, "even if all public contract rights warranted the procedural protections of due process, there would be a substantial argument that in most circumstances post-deprivation state court remedies would provide all the process that is due." *Id.* at 966. Having decided that plaintiffs have no constitutionally protect property interest here, the Court need not resolve whether the Town afforded plaintiffs constitutionally sufficient due process either through pre-deprivation processes or post-deprivation remedies.[2] According-

---

**2.** For this same reason, the Court need not address the Town's argument that the doctrines of legislative or qualified immunity act as a bar to the § 1983 claims brought against defendants Schantz or Burke individually.

ly, the Town's motion for summary judgment on plaintiffs' first claim is granted.

## B. ADEA and NYHRL claims

### 1. Exhaustion of remedies

Preliminarily, I reject the Town's argument that plaintiffs' ADEA claim must be dismissed because they brought suit in federal court before filing a complaint with the Equal Employment Opportunity Commission ("EEOC") and before the EEOC issued a right-to-sue letter. The record shows the plaintiffs filed their initial complaint, which did not contain an ADEA claim, on June 14, 2001. Dkt. # 1. On June 15, 2001, plaintiffs filed charges of age and disability discrimination with the EEOC. Dkt. # 29, Exs. CC, DD, EE, FF. On August 22, 2001, plaintiffs filed an amended complaint that included a claim based on the ADEA. Therefore, plaintiffs have complied with the ADEA's statutory prerequisite for bringing an action in federal court. Further, unlike Title VII, the ADEA does not require that the EEOC issue a right-to-sue letter in order for a federal lawsuit to be commenced. *See Tolliver v. Xerox Corp.*, 918 F.2d 1052, 1057 (2d Cir.1990).

### 2. Election of remedies

Unequally unavailing is the Town's argument that by filing a charge of discrimination with the EEOC, which referred the charges to New York's State Division on Human Rights, plaintiffs elected to pursue their administrative remedies only and are precluded now from pursuing their claims in court. As plaintiffs correctly point out, New York Executive Law § 297(9) and its corresponding regulations specifically provide that when the EEOC refers a charge to the State Division of Human Rights, the referred charge is not deemed to have been filed by plaintiffs with that agency for election of remedy purposes. N.Y. EXEC.

L. § 297(9); 9 NYCRR § 465.5(b); *see also Melendez v. Int'l Serv. Sys., Inc.*, No. 97 CIV. 8051, 1999 WL 187071 (S.D.N.Y. Apr. 6, 1999). That the preprinted EEOC charge form states in small print just above the signature line that the signatory wants the charge filed "with both the EEOC and the State or Local Agency, if any," *see* Dkt. # 29, Ex. CC, does not change the result. *See Gonzalez v. Police Comm'r*, No. 97 CIV. 2264, 2000 WL 1191558, *4 (S.D.N.Y. Aug. 22, 2000) ("The Court is not persuaded that [plaintiff's] having checked a box indicating that the complaint should also be filed with the State Division of Human Rights controls the outcome of this issue as a matter of law.").

### 3. NYHRL claims

Plaintiffs' claim that the Town provided disparate insurance coverage to them on the basis of age cannot be sustained under NYHRL. New York Executive Law § 296(3–a) provides: "[i]t shall be an unlawful discriminatory practice: (a) For an employer ... to refuse to hire or employ ... an individual eighteen years of age or older, or to discriminate against such individual in promotion, compensation or in terms, conditions, or privileges of employment, because of such individual's age." However, the statute contains several exceptions, including a provision that states: "nor shall anything in such subdivisions or such article be deemed to preclude the varying of insurance coverages according to an employee's age." Plaintiffs have cited no cases to support their claim under the NYHRL, and I have found no cases in New York that address this specific provision. Based on the plain reading of the statute, and in the absence of any authority to the contrary, this claim is dismissed.

The Town is also entitled to summary judgment on plaintiffs' fourteenth

cause of action for disability discrimination in violation of New York Human Rights Law § 296. Neither party submitted case law regarding whether New York Human Rights Law § 296 recognizes such a claim. However, Second Circuit case law interpreting Title I of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12111–12117, is instructive. The Second Circuit recently joined six other Circuits in holding that the ADA does not prohibit employers from offering different insurance coverage to those with disabilities, so long as every employee is offered the same coverage regardless of current or future disability status. *See Equal Employment Opportunity Comm'n v. Staten Island Savings Bank,* 207 F.3d 144, 150 (2d Cir.2000). Given that disability claims pursuant to the ADA and the NYHRL are analyzed substantially the same, *see Lalla v. Consol. Edison Co. of New York, Inc.,* 2001 WL 456248, *2 (S.D.N.Y.2001), plaintiffs' claim must fail.

Even assuming, without deciding, that plaintiffs could establish a prima facie case of disability discrimination, there is absolutely no evidence in this record that the Town based its decision to change retiree benefits on the fact that plaintiffs suffered from the various medical conditions alleged. In fact, the Town submitted the sworn affidavit of its supervisor David Schantz who stated that "the only reason why the health care coverage of the retirees involved in this litigation was modified was to cut costs." Dkt. # 29, Schantz Aff., ¶ 27. Plaintiffs failed to raise an issue of fact that this reason was a pretext for disability discrimination. Therefore, their claim for disability discrimination must be dismissed.

**4. Applicability of OWBPA to plaintiffs' retiree health benefits**

■ Next, the Town argues that the Older Workers Benefit Protection Act

("OWBPA"), Pub.L. No. 101–433, 104 Stat. 978 (1990), which made several amendments to the ADEA, should not apply in this case because the retiree health care plan was in effect prior to OWBPA's enactment. Dkt. # 42, p. 11. I disagree.

When enacted by Congress in 1990, OWBPA included a "continued benefit payments" exemption that excluded from its reach any "series of benefit payments made to an individual or the individual's representative that began prior to the effective date and that continue after the effective date *pursuant to an arrangement that was in effect on the effective date* ...." OWBPA § 105(e) (emphasis added). The Town argues this exemption applies to its retiree health care policy because plaintiffs began receiving a "series" of benefit payments before OWBPA was enacted, pursuant to a benefit plan adopted in 1978, and plaintiffs continued to receive that series of benefits after the effective date of the statute.

However, the Town adopted this particular benefit plan in 2001, not 1978. The fact that the Town modified or amended a benefit plan that had been in place prior to OWBPA's enactment is of no consequence. OWBPA expressly applies to "any employee benefit established *or modified* on or after the date of enactment of this Act." OWBPA § 105(a)(1) (emphasis added). The Town's reliance on *Riva v. Massachusetts,* 61 F.3d 1003 (1st Cir.1995) is misplaced. In *Riva,* plaintiffs challenged a disability retirement plan that reduced plaintiffs' benefits upon attaining the age of 65. The Court held that OWBPA did not apply because the retirement plan, and its age 65 benefit reduction, was already "in effect" when OWBPA was passed. *Riva,* 61 F.3d at 1007–1008. Here, in contrast, the Town did not reduce plaintiffs' health care coverage pursuant to "an ar-

rangement that was in effect" at the time of OWPBA's enactment. Rather, the Town adopted a *new* resolution substantially modifying the previous arrangement regarding plaintiffs' health care benefits. Therefore, the new benefit plan is subject to scrutiny under OWBPA. *See Equal Employment Opportunity Comm'n v. Home Ins. Co.*, 672 F.2d 252, 259 n. 9 (2d Cir.1982) ("The mere fact that an employer had a pre-Act plan that arguably complied with the Act cannot validate the plan's post-Act modification to introduce new age-discriminatory terms.").[3]

### 5. Disparate treatment claim under the ADEA [4]

■ Turning now to the merits of plaintiffs' ADEA claim, plaintiffs allege the Town is violating the ADEA in two respects. First, plaintiffs argue that the Town engaged in "reverse discrimination" by discontinuing Blue Million coverage for retirees under the age of 80 only. The Second Circuit has yet to address whether the ADEA provides a remedy for so-called reverse age discrimination. Other Circuit Courts of Appeal rejected claims based on such a theory, *see, e.g., Hamilton v. Caterpillar Inc.*, 966 F.2d 1226 (7th Cir.1992); *Schuler v. Polaroid Corp.*, 848 F.2d 276, 278 (1st Cir.1988), as have several District Courts. *See, e.g., Dittman v. Gen. Motors Corp.*, 941 F.Supp. 284 (D.Conn.1996), *aff'd on other grounds*, 116 F.3d 465 (2d Cir. 1997); *Parker v. Wakelin*, 882 F.Supp. 1131, 1140 (D.Me.1995); *see also Greer v.*

*Pension Benefit Guar. Corp.*, No. 00 CIV. 1272, 2001 WL 137330 (S.D.N.Y. Feb. 15, 2001) (commenting, without ruling, that several courts rejected reverse age discrimination claims). The Court of Appeals for the Sixth Circuit has held otherwise, *see Cline v. Gen. Dynamics Land Sys., Inc.*, 296 F.3d 466, 470–71 (6th Cir.2002) (holding that a plain reading of the ADEA permits younger workers in protected class to sue employers for age discrimination in favor of older workers in protected class), but it remains the minority rule.

I agree with the Seventh Circuit's reasoning in *Hamilton* that "[t]here is no evidence in the legislative history that Congress had any concern for the plight of workers arbitrarily denied opportunities and benefits because they are too *young.*" *Hamilton*, 966 F.2d at 1228 (emphasis in original). I also agree that if the ADEA was meant to prevent "reverse" age discrimination in the same way that Title VII prevents discrimination against men as well as women, or discrimination against whites as well as racial minorities, "limiting the protected class to those 40 and above would make little sense." *Id.* at 1227. Therefore, plaintiffs' ADEA claim based on the Town's more favorable treatment to retirees over the age of 80 is dismissed.

■ Second, plaintiffs allege that the Town discriminates on the basis of age because it offers retirees 65 and older who are Medicare-eligible inferior health care

---

3. Additionally, I reject the Town's argument that OWPBA applies only to current, not retired, employees. *See Erie County Retirees Ass'n v. County of Erie*, 220 F.3d 193, 209 (3d Cir.2000), *cert. denied* 532 U.S. 913, 121 S.Ct. 1247, 149 L.Ed.2d 153 (2001).

4. I agree with the Town that the part of plaintiffs' ADEA claim based on disparate impact must be dismissed. The Town correctly argues that in order for plaintiffs to rely on a

disparate impact theory, their action must "allege a disparate impact on the entire protected group, *i.e.* workers aged 40 and over." *Criley v. Delta Air Lines, Inc.*, 119 F.3d 102, 105 (2d Cir.1997). Clearly, the disparate impact theory of liability cannot apply in this case because some of the very persons plaintiffs allege were treated more favorably, retirees age 55 to 64 and retirees over age 80, are in the protected group themselves.

benefits than it does for retirees under the age of 65, who are not eligible for Medicare. Specifically, plaintiffs cite to what they describe as "a far more meager prescription drug benefit" offered under the Blue Choice Senior and Supplemental H plans, as compared to that offered under the Blue Choice Select plan. Dkt. # 17, p. 12.

The Town asserts that it did not discriminate against plaintiffs because it had a legitimate, nondiscriminatory reason based solely on financial considerations to change their health care benefits. The Town also argues that Blue Cross/Blue Shield does not offer Blue Choice Select to retirees who are Medicare-eligible and that it had no control over the level of benefits provided under the Blue Choice Senior or Supplemental H plans.

The Town's argument regarding its motive is not persuasive. "In cases such as this, where there is direct evidence that the disparate treatment ... is age-dependent, the *McDonnell Douglas* search for a motive is unnecessary and therefore inapplicable." *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985) (transfer policy that denied 60 year old captains right to become flight engineers instead of retiring, but provided that right to younger captains, was discriminatory on its face); *see also Johnson v. State of New York,* 49 F.3d 75, 78–79 (2d Cir.1995). While the Town may have had legitimate financial reasons for implementing the new retiree health benefit policy, that policy may nonetheless violate the ADEA if it provides inferior benefits to retirees based solely on their age, unless the policy falls within one of the ADEA's safe harbor provisions. *See Johnson,* 49 F.3d at 80.

I also reject the Town's argument that it should not be liable because it made available only the benefit plans offered by Blue Cross/Blue Shield to retirees over the age of 65. Similar arguments were rejected in *Arizona Governing Comm. for Tax Deferred Annuity and Deferred Comp. Plans v. Norris,* 463 U.S. 1073, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983), and *Johnson,* 49 F.3d at 79. In *Norris,* the Supreme Court held that the State of Arizona could not escape liability under Title VII by claiming that the parties with which it contracted to provide fringe benefits to its employees set the policy in such a way that was discriminatory. The Supreme Court stated that "the State cannot disclaim responsibility for the discriminatory features of the insurers' options. Since employers are ultimately responsible for the 'compensation, terms, conditions, [and] privileges of employment' provided to employees, an employer that adopts a fringe-benefit scheme that discriminates among its employees ... violates Title VII regardless of whether third parties are also involved in the discrimination." *Norris,* 463 U.S. at 1089, 103 S.Ct. 3492. Likewise, the Second Circuit rejected the State's argument in *Johnson* that it merely adopted the Air National Guard's mandatory age–60 retirement policy as a term of employment for its civilian air base guards.

On this record though, plaintiffs are not entitled to summary judgment because the ADEA provides a so-called "safe harbor" provision for bona fide employee benefit plans, including plans that provide different benefits for retirees over 65. *See* 29 U.S.C. § 623(f)(2)(B)(i). Whether the safe harbor provisions apply cannot be determined on this record.

A benefit plan will not violate the ADEA if, "for each benefit or benefit package, the actual amount of payment made or cost incurred on behalf of an older worker is no less than that made or incurred on behalf of a younger worker, as permissible under

section 1625.10, title 29, Code of Federal Regulations." 29 U.S.C. § 623(f)(2)(B)(i).

The 'equal cost or equal benefit' safe harbor could apply in the context of this case, where the Town offers different health care benefits to retirees once they become Medicare-eligible at age of 65. As set forth in the ADEA's regulations:

> An employer does not violate the Act by permitting certain benefits to be provided by the Government, even though the availability of such benefits may be based on age. For example, it is not necessary for an employer to provide health benefits which are otherwise provided to certain employees by Medicare. However, the availability of benefits from the Government will not justify a reduction in employer-provided benefits if the result is that, taking the employer-provided and Government-provided benefits together, an older employee is entitled to a lesser benefit of any type (including coverage for family and/or dependents) than a similarly situated younger employee. For example, the availability of certain benefits to an older employee under Medicare will not justify denying an older employee a benefit which is provided to younger employees and is not provided to the older employee by Medicare.

29 C.F.R. § 1625.10(e).

The Third Circuit Court of Appeals addressed these issues in a case quite similar to the case at bar. In *Erie County Retirees Ass'n v. County of Erie*, 220 F.3d 193 (3d Cir.2000), the Third Circuit held that the ADEA applied to a continuous benefit plan pursuant to which Medicare-eligible retirees allegedly received inferior health benefits to those benefits received by retirees who had not yet attained Medicare-eligibility status (i.e. age 65). In so holding, the Third Circuit carefully examined the legislative history of OWBPA and its corresponding regulations and found that the ADEA applied to retiree benefits. It further held that, although the ADEA meant to allow employers to coordinate retiree health benefit plans with Medicare benefits, the resulting plan would have to meet the requirements of 29 U.S.C. § 623(f)(2)(B)(i) and 29 C.F.R. § 1625.10(e). *Id.* at 204–208. The Court remanded the case to the District Court with instructions regarding application of the equal cost or equal benefit safe harbor, stating:

> the 'equal benefit' prong of the analysis should take into account equally both the Medicare-provided and the County-provided benefits which members of the plaintiff class receive. If the County cannot satisfy the 'equal benefit' prong, the court should then turn to the 'equal cost' inquiry.... [T]he purpose of the equal benefit or equal cost standard is to encourage employers to spend equally on benefits for older and younger persons.... Accordingly, the district court should consider only those costs which the County itself incurs.

*Id.* at 216.

Here, the Town has the burden of proving that the new policy falls within the safe harbor provision provided for under OWPBA. The Town can make this showing by demonstrating that the benefits offered retirees under the age of 65 pursuant to the Blue Choice Select plan are equal in cost or benefits to those benefits offered to plaintiffs under the Blue Choice Senior or Supplemental H plan.

Plaintiffs argue that summary judgment is appropriate at this stage because the Town can never meet its burden of proof that the safe harbor applies because they receive vastly inferior prescription drug coverage with Blue Choice Senior and Supplemental H than retirees with Blue Choice Select coverage. Dkt. # 37, pp. 5–

6. As evidence of that fact, plaintiffs submit two comparison charts purporting to show the difference in benefits between Blue Million Preferred and Blue Choice Select coverage, *see* Dkt. # 23, Ex. D, and Blue Million Complementary, Supplemental H, and Blue Choice Senior coverage. Dkt. # 23, Ex E. Further, plaintiffs submit a cost analysis prepared by the Town regarding the differences in cost between Blue Million and Blue Choice Senior, and Supplemental H Plans. Dkt. # 23, Ex. F.

I am not convinced though that plaintiffs have carried their burden to prove that judgment should be granted as a matter of law. A genuine issue of material fact exists regarding whether the benefits provided under Blue Choice Select are equal to the benefits provided by Blue Choice Senior or Supplemental H. The ADEA regulations provide for two approaches for conducting the equal benefit analysis—a "benefit-by-benefit" approach or a "benefit package" approach. *See* 29 C.F.R. § 1625.10(f)(1) and (2). The parties do not address which approach should be used here, nor do they apply the limited information in the record regarding the scope of the benefits to the analysis called for in the regulations. While the information provided by plaintiffs indicates that the prescription drug benefits under Blue Choice Select are more extensive than those offered under either Blue Choice Senior or Supplemental H, that does not end the inquiry. It is unclear whether those are the only prescription drug benefits offered under the plans and whether the benefits offered pursuant to the prescription drug riders to each plan are included in the summaries. Also, it is unclear whether Medicare allows for any prescription drug coverage at all.

Moreover, even if the benefits under each of the plans are not equal, the safe harbor could still apply. Under the benefit-by-benefit approach, an employer need not provide the same amount or level of benefits provided that the employer is paying equal costs for older and younger employees alike. However, an employer must produce the necessary cost data to show that the reduction in benefits is warranted. In addition, the reduction in benefits can be no greater than is justified by the increased cost of supplying the benefits to older retirees. *See* S.Rep. No. 101–263 at 19, *reprinted in* 1990 U.S.C.C.A.N. 1509, 1524.

There also is a genuine issue of material fact regarding whether the Town pays an amount for health care benefits to retirees under the age of 65 equal in cost to the amount paid for benefits to retirees over the age of 65. The Town submitted evidence that it pays a premium cost per month of $211.64 for single person coverage for Blue Choice Select, $190.30 for Supplemental H coverage, and $160.05 for coverage for Blue Choice Senior. *See* Dkt. # 43, Watro Reply Aff., ¶¶ 22–24. At first glance, it appears that the Town cannot meet the equal cost safe harbor. However, the Town also submitted evidence that it pays *more* in cost for the prescription drug rider to Blue Choice Senior ($71.05), than for the prescription drug rider to Blue Choice Select ($31.05). *Id.* at ¶¶ 16–17. Yet, it is unclear whether the prescription drug rider costs are included in the premium costs above, or if the Town pays these costs separately. It is also unclear whether any prescription drug coverage is included in the cost of the Blue Choice Select plan alone, without the prescription drug rider, thus rendering any cost comparison of the two drug rider plans useless.[5]

---

**5.** I also note that while the record indicates the Town is paying those costs, there is some

There are too many facts in dispute concerning both the nature of the benefits provided and the costs to decide this issue as a matter of law at this juncture. The parties apparently agreed that they would not engage in extensive discovery prior to making these motions and, therefore, the record on these issues is not as complete as it could be. Given the detailed analysis called for by the ADEA regulations, it seems provident to afford the parties the opportunity to conduct discovery on these issues. Therefore, plaintiffs' motion and the Town's cross-motion for summary judgment on plaintiffs' ADEA claim are denied.[6]

## C. Breach of contract claims

■ Additionally, I find that there exist issues of fact precluding summary judgment on plaintiffs' breach of contract claims.[7]

"The primary objective in contract interpretation is to give effect to the intent of the contracting parties 'as revealed by the language they chose to use.' ... In a contract dispute a motion for summary judgment may be granted only where the agreement's language is unambiguous and conveys a definite meaning." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091 (2d Cir.1993) *quoting Seiden Assocs. v. ANC Holdings,*

*Inc.,* 959 F.2d 425, 428 (2d Cir.1992) (internal citations omitted).

Whether a writing is ambiguous is a question of law for a court, *W.W.W. Assocs.,* 77 N.Y.2d at 162, 565 N.Y.S.2d 440, 566 N.E.2d 639, while the meaning of an ambiguous contract is a question of fact for a factfinder, *Revson v. Cinque & Cinque, P.C.,* 221 F.3d 59, 66 (2d Cir. 2000). A contract is ambiguous where its terms "suggest more than one meaning" when viewed objectively by a reasonably knowledgeable person who has examined the context of the entire integrated agreement. *Alexander & Alexander Servs. v. These Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d Cir.1998). If contractual terms have a definite and precise meaning and are not reasonably susceptible to differing interpretations, they are not ambiguous. *Seiden Assocs. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992). *Scholastic, Inc. v. Harris,* 259 F.3d 73, 82 (2d Cir.2001).

I find as a matter of law that the terms of the 1978 Manual related to retiree health care benefits are ambiguous. Viewing the Manual as an entire integrated agreement, the meaning of "Blue Cross/ Blue Shield coverage" is subject to differing interpretations, particularly when viewed in light of the whole Manual. In

indication it may be passing them on to the retirees. For instance, the Town admitted in its response to plaintiffs' Statement of Undisputed Facts that plaintiffs are paying their own premiums for prescription drug coverage. Dkt. # 22, ¶ 13; Dkt. # 32, ¶ 13.

6. In developing the record further, the parties should pay particular attention to the regulations contained in 29 C.F.R. § 1625.10, and the explanations of how those provisions should be applied, as set forth throughout the legislative history. *See* S.Rep. No. 101–263 at 19, *reprinted in* 1990 U.S.C.C.A.N. 1509, *et seq.* The parties should focus on which ap-

proach should be used in applying the equal cost or equal benefit safe harbor, whether the parties mean to compare only the prescription drug benefits afforded retirees or the entire benefit package and the parties should provide a more detailed analysis regarding the costs to the Town for providing coverage to Medicare-eligible retirees.

7. Plaintiffs assert several common law contract-based claims, including breach of contract, breach of the implied covenant of good faith and fair dealing, reformation of contract, estoppel and unjust enrichment. Dkt. # 11.

fact, there are several references in the 1978 Manual to Blue Cross/Blue Shield coverage and it is not clear whether one, two or three different types of coverage are referenced. At some places, the 1978 Manual refers to *"traditional* Blue Cross/Blue Shield coverage," at other places the phrase "Blue Cross/Blue Shield *Group* coverage" is used, and at others the Manual provides for "Blue Cross/Blue Shield coverage." *See* Dkt. # 29, Ex. E, at V–4, ¶ 1, and V–5, ¶¶ 1, 5, 10, 15, 25 (emphasis supplied). The 1978 Manual does not define these terms and no explanation is readily apparent from the Manual itself for the different terminology. In addition, neither party submitted evidence regarding what those terms meant to Blue Cross or the health care industry at the time the Manual was written in 1978. Seemingly, what we perceive of now as "traditional" coverage has a different meaning today than in 1978.

In addition, the 1978 Manual is ambiguous as to whether the benefits were meant to be permanent once vested. The 1978 Manual does not contain a provision reserving the Town's right to revoke any of the provisions. In *Emerling v. Village of Hamburg,* 255 A.D.2d 960, 680 N.Y.S.2d 37 (4th Dep't 1998), the Appellate Division found this fact persuasive, holding that:

> A municipality may, by a clear reservation of rights, retain the power to terminate benefits that would otherwise be considered vested (*see, Roddy v. Valentine, supra,* at 268 N.Y. 228, 231–232, 197 N.E. 260; *see also, Matter of Lippman v. Board of Educ.,* 66 N.Y.2d 313, 319–320, 496 N.Y.S.2d 987, 487 N.E.2d 897). Nothing in section 14 of the rules and regulations, however, gives the Village the power to terminate plaintiffs' medical benefits. Furthermore, while there is elsewhere in the rules and regulations in provision making those rules and regulations subject to amendment, nowhere is the right to terminate the medical benefits of retirees expressly reserved.

*Emerling,* 255 A.D.2d at 960, 680 N.Y.S.2d 37.

"When the terms of a contract are ambiguous, reasonably subject to differing interpretations, a court may turn to evidence extrinsic to the agreement's four corners to ascertain the intent of the parties." *Scholastic, Inc.,* 259 F.3d at 82. Here, however, the ambiguity is only exacerbated by resort to such evidence.

Plaintiffs submitted the affidavit of Daniel Deming, the Town Supervisor from 1972 through 1979, who personally participated in meetings and decisions with Blue Cross/Blue Shield to set the appropriate level of employee and retiree benefits. Dkt. # 18. According to Deming the Town knew it was setting "a permanent policy" and intended to give lifetime coverage at the same level to retirees. *Id.* at ¶ 25, 36. Deming claims the language used in the provision related to retirees meant Blue Million coverage. *Id.* at ¶ 36.

Plaintiffs also submitted their own affidavits stating that they were told by Town personnel that such benefits would be for life, that they relied on those benefits in making decisions about when to retire, and that they had always understood the benefits would be paid if they completed the conditions set forth in the 1978 Manual. *See* Dkts. ## 19, 20, 21, and 25.

However, the Town submitted the affidavit of its current Supervisor, David Schantz, who states that the Town's decision to provide benefits to its employees and retirees is and has always been a matter of the Town's discretionary powers. Dkt. # 29, Schantz Aff., ¶ 7. The Town also submitted the affidavit of Beth Watro, the administrator of employee benefits for the Town since 1981 and the person to whom

questions regarding benefits were directed. When asked, Watro always told employees benefits were revocable by the Town at any time. Dkt. # 29, Watro Aff., ¶ 27. Watro remembers discussing the Blue Million Plan with plaintiff Fontana, but denies that she told her or anyone else that retirees would always be entitled to Blue Million coverage. *Id.* at ¶¶ 29–32.

I find an issue of fact exists regarding the meaning of Blue Cross/Blue Shield coverage, whether the Town intended to give irrevocable benefits, whether the Town officials promised plaintiffs such permanent benefits, and whether the Town, by changing the level of benefits, breached any such promise. *Weiner v. McGraw–Hill, Inc.,* 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441 (1982); *Scholastic,* 259 F.3d at 82–84; *Emerling,* 255 A.D.2d at 960, 680 N.Y.S.2d 37. While the record shows the Town continuously made changes to certain fringe benefits, such as sick days and vacation time, no changes were made to benefits that arguably had 'vested', that is until the changes made to the retirees health benefits in March 2001.

The Town's attempt to distinguish this case from *Emerling v. Village of Hamburg,* 255 A.D.2d 960, 680 N.Y.S.2d 37 (4th Dep't 1998) is unpersuasive. In *Emerling,* Village retirees brought a claim seeking to enforce an implied promise by the Village, made in 1980 and written in the Village's Rules and Regulations, to provide retiree health care benefits for life. The Appellate Division affirmed the grant of summary judgment to the retirees where they established they accepted the Village's implied promise to provide retiree health care benefits if they worked for the Village for at least ten years and retired after reaching the age of 55. According to the Appellate Division the Village's "offer, when accepted by plaintiffs by the rendering of 10 years or more of continuous

service, became irrevocable." *Id.* at 962, 680 N.Y.S.2d 37.

Plaintiffs argue *Emerling* requires they be granted summary judgment. I disagree. In *Emerling,* the Village completely revoked the retirees' health care benefits, leaving them with no coverage whatsoever. Thus, once the court found the Village was obligated to provide such benefits, there was no question that it breached that obligation. Here, however, the Town continues to pay for medical benefits, but with less coverage than before. It cannot be said as a matter of law that the Town breached its obligation. Further, the provision conferring benefits in *Emerling* explicitly promised to provide such benefits "until the employee's or official's death." Here, the 1978 Manual contains no such language.

In addition, I reject the Town's assertion that an Article 78 proceeding is the only remedy available to plaintiffs and that a breach of contract action is inappropriate. The New York Court of Appeals has recognized:

'there are circumstances in which the same governmental action may constitute a violation of contract and also be of a character that would support a claim for article 78 relief' (*Matter of Goodstein Constr. Corp. v. Gliedman,* 117 A.D.2d 170, 176, 502 N.Y.S.2d 136 (1st Dep't 1986) [Sandler, J. P., concurring] ), *affd* 69 N.Y.2d 930, 516 N.Y.S.2d 655, 509 N.E.2d 350. However, the issues presented in a contract action differ significantly from those presented in an article 78 proceeding. When the damage allegedly sustained arises from a breach of the contract by a public official or governmental body, then the claim must be resolved through the application of traditional rules of contract law. On the other hand, when a petitioner asserts that the determination of a governmen-

tal body or public official is 'in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion' and seeks nullification of same, then an article 78 proceeding is the appropriate vehicle through which the claim may be addressed (CPLR 7803).

Thus, where the language of the complaint asserts violations of a plaintiff's rights under a contract and the primary thrust of the allegations is in contract, a plenary action sounding in contract is the appropriate remedy. Stated differently, where the focus of the controversy is on an agency's breach of an express contractual right, or on the agency's violation of the implied obligations of good faith, fair dealing and cooperation, a contract action is the recommended remedy.

*Abiele Contracting, Inc. v. New York City Sch. Const. Auth.*, 91 N.Y.2d 1, 7–8, 666 N.Y.S.2d 970, 689 N.E.2d 864 (1997).

Here, plaintiffs are seeking to enforce alleged contract rights arising from the language of the 1978 Manual. Plaintiffs seek monetary damages arising from this alleged breach and restitution of their Blue Million coverage. Plaintiffs are not arguing that the Town acted in violation of lawful procedure, was arbitrary and capricious, or abused its discretion in changing their health care benefits, nor do they seek to reinstate the former retiree health care policy or to annul the decision of the 2001 Town Board. Accordingly, this plenary action is proper.

I also reject the Town's argument that no breach of contract claim exists because the Town adopted the 1978 Manual by resolution. While a municipal resolution alone is "a unilateral action that is temporary in nature and, thus, it does not create any vested contractual rights," *Aeneas McDonald Police Benevolent Ass'n. v. City of Geneva*, 92 N.Y.2d 326, 333, 680 N.Y.S.2d 887, 703 N.E.2d 745 (1998), plaintiffs assert their right to benefits arises from the language of the 1978 Manual, including its preamble, the alleged assurances of Town officials, as well as their own and the Town's past conduct, not from the enabling resolution alone.

The Court of Appeals recognized this distinction in *Aeneas* when it held that there was no legal or contractual impediment to the City of Geneva's unilateral alteration of police officer retiree health care benefits because petitioner "failed to put forth any evidence, beyond the language of Resolution No. 33, that might establish either that an independent agreement to supply health benefits supported by consideration existed, or that any one of the collective bargaining agreements between the parties is ambiguous on the issue of health benefits for retirees, and thus susceptible to interpretation by parole evidence." *Aeneas*, 92 N.Y.2d at 333, 680 N.Y.S.2d 887, 703 N.E.2d 745; *see also Lippman v. Bd. of Educ. of Sewanhaka Cent. High Sch. Dist.*, 66 N.Y.2d 313, 315, 496 N.Y.S.2d 987, 487 N.E.2d 897 (1985) (plaintiffs' claim for retiree health care benefits failed because "there was no contract, express or implied" to provide benefits).

Like any other contracting party, the Town can enter into binding obligations and make promises to perform in the future. That the Town passed a resolution adopting the 1978 Manual does not mean that the promises contained therein, if any, could be revoked unilaterally, particularly where plaintiffs have provided consideration to the Town by way of their continued service with the Town for more than ten years and their foregoing retirement until reaching the age of 55. *See Emerling*, 255 A.D.2d at 960, 680 N.Y.S.2d 37.

The Town's reliance on *Handy v. County of Schoharie*, 244 A.D.2d 842, 665 N.Y.S.2d 708 (3d Dep't 1997), is misplaced for this very reason. In *Handy*, a retired board of supervisor member sought to enforce the County board of supervisors' motions, passed just two weeks before his retirement, that provided health insurance benefits to retired elected officials who served ten or more years with the County. Within weeks, the board of supervisors rescinded the motions. The Court held that the plaintiff had no vested contract rights to enforce and that the motions passed by the board did not create enforceable contractual property rights. *Id.* at 844, 665 N.Y.S.2d 708. Importantly, there was no risk that the plaintiff in *Handy* relied on the assurances of the board of supervisors' motions or provided any consideration to the County in reliance on its promise of medical benefits. *See also Aeneas*, 92 N.Y.2d at 329–30, 680 N.Y.S.2d 887, 703 N.E.2d 745 (alleged entitlement to retiree health benefits not contingent on completing a certain number of years of service).

For these reasons, plaintiffs' motion and the Town's cross-motion for summary judgment on the breach of contract claims are denied.

### D. Fraud and misrepresentation claims

■ The Town is entitled to summary judgment on plaintiffs' fraud and misrepresentation claims. "[A] fraud claim should be dismissed as redundant when it merely restates a breach of contract claim, *i.e.*, when the only fraud alleged is that the defendant was not sincere when it promised to perform under the contract." *U.S. Network Servs., Inc. v. Frontier Commun. of the West, Inc.*, 115 F.Supp.2d 353, 355–56 (W.D.N.Y.2000) (interpreting New York law); *see also Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*, 56 F.3d 427 (2d Cir.1995).

Here, the essence of plaintiffs' claim is simply that the Town represented in its 1978 Manual that it would provide a certain level of benefits and that it did not live up to its promise. This promise was in the nature of a future intent to perform, which is duplicative of the contract claim. Plaintiffs allege no misrepresentations of fact by the Town regarding the provision of benefits that were collateral to the contract itself. Unlike those cases relied on by the Town, this case is not one in which plaintiffs allege that, at the time it made the representation about retiree health benefits, the Town had no intention of keeping that promise. *See, e.g., Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992) (fraudulent inducement claim based on misrepresentation of a material fact that employee would be made head of newly formed litigation department not duplicative of breach of employment contract claim where plaintiff alleged statement was false when made). Furthermore, plaintiffs seek the same damages from the contract and fraud claims. Therefore, these claims are duplicative of plaintiffs' contract claims and must be dismissed. *U.S. Network Servs., Inc.*, 115 F.Supp.2d at 356; *see also Page v. Muze, Inc.*, 270 A.D.2d 401, 402, 705 N.Y.S.2d 383 (2d Dep't 2000) (fraud claims were properly dismissed as duplicative of contract claims, since they alleged in essence that defendants promised to give plaintiff equity interest in company, and that they reneged on that promise); *Orix Credit Alliance, Inc. v. R.E. Hable Co.*, 256 A.D.2d 114, 115, 682 N.Y.S.2d 160 (1st Dep't 1998) ("a viable claim of fraud concerning a contract must allege misrepresentations of present facts (rather than merely of future intent) that were collateral to the contract and which induced the allegedly defrauded party to enter into the con-

tract.... Allegations that a party entered into a contract without intent to perform do not state a cause of action for fraud.") (citation omitted); *J.E. Morgan Knitting Mills, Inc. v. Reeves Bros., Inc.*, 243 A.D.2d 422, 423, 663 N.Y.S.2d 211 (1st Dep't 1997) ("Plaintiffs' cause of action for fraud ... was properly dismissed as duplicative of plaintiffs' cause of action for breach of contract. The fraud alleged is based on the same facts as underlie the contract claim and is not collateral to the contract and no damages are alleged that would not be recoverable under a contract measure of damages").

Even if plaintiffs could bring fraud and misrepresentation claims independent of their contract claims, plaintiffs failed to submit affidavits or documents to support the conclusion that the Town "acted with fraudulent intent" or "with a 'preconceived and undisclosed intention of not performing.'" *U.S. East Telecomm., Inc. v. U.S. West Communs. Servs., Inc.*, 38 F.3d 1289, 1302 (2d Cir.1994). Therefore, summary judgment in favor of the Town is proper on these claims.

■ Similarly, the Town is entitled to summary judgment on plaintiffs' seventh cause of action for conversion. Plaintiffs filed no opposition to the Town's motion for summary judgment on this claim. In any event, "an action for conversion cannot be predicated on a mere breach of contract ...." *Yeterian v. Heather Mills N.V. Inc.*, 183 A.D.2d 493, 583 N.Y.S.2d 439 (1st Dep't 1992); *see also Kubin v. Miller*, 801 F.Supp. 1101, 1118 (S.D.N.Y.1992) *quoting Matzan v. Eastman Kodak Co.*, 134 A.D.2d 863, 521 N.Y.S.2d 917 (4th Dep't 1987) ("an action in tort, such as conversion, may not lie for simple 'non-performance under an alleged agreement'."). Here, plaintiffs' conversion claim "merely restates the cause of action for breach of contract and alleges no independent facts

sufficient to give rise to tort liability." *Yeterian*, 183 A.D.2d at 494, 583 N.Y.S.2d 439.

### E. New York State Constitution claim

■ Plaintiffs' claim based on a violation of Article V, Section 7 of the New York State Constitution must be dismissed. That provision states that "membership in any pension or retirement system of the state or of a civil division thereof shall be a contractual relationship, the benefits of which shall not be diminished or impaired." N.Y. CONST. ART. 5, § 7. The New York Court of Appeals unequivocally held that "[h]ealth insurance benefits are not within the protection of article V, section 7 of the State Constitution ...." *Lippman v. Board of Educ. of the Sewanhaka Cent. High Sch. Dist.*, 66 N.Y.2d 313, 315, 496 N.Y.S.2d 987, 487 N.E.2d 897 (1985) (school district's contributions to its retired teachers' health insurance premiums were not contractual pensions benefits entitled to constitutional protection). Rather, "[t]hat provision protects only the benefits of membership in a retirement system; other employment conditions, though they may be protected by statute, resolution or individual or collective bargaining agreement, are not within its coverage." *Id.* at 317, 496 N.Y.S.2d 987, 487 N.E.2d 897. Plaintiffs' attempt to distinguish *Lippman* is unpersuasive. *See* Dkt. # 37, pp. 30–31. While the Town made entitlement to retiree health care benefits contingent on qualification for benefits under the New York State retirement system, "more than an incidental relationship to the retirement system must be found before an employee benefit will be held to be within the area of action prohibited by the Constitution." *Id.*

## 2. Class Certification

Plaintiffs filed a motion for class certification pursuant to FED. R. CIV. P. 23 seeking to maintain this action on behalf of themselves and a purported class of 33 members. Plaintiffs also seek permission to pursue the ADEA claim as a collective action, in accordance with the provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*

Plaintiffs define the proposed class as "all retired employees of the Town of Irondequoit who retired from service with the Town after reaching the age of fifty-five (55) or older and attaining 10 or more years of regular, full-time employment as a town employee, and who had not reached the age of eighty (80) as of July 1, 2001." Plaintiffs allege class certification is appropriate because the factual basis for this suit is the same for all class members: all received a copy of the 1978 Manual; all worked for the Town in reliance on the benefit promise; all received health benefits under the Blue Million Plan at their retirement; and all are seeking restoration of the Blue Million coverage.

### A. Collective action pursuant to FLSA § 216(b)

■ Initially, I reject the Town's argument that a collective action is inappropriate because the putative class members have not filed charges of discrimination with the EEOC within 300 days of the discriminatory act. It is well-settled that pursuant to the single filing rule, "the timely filing of an administrative charge by a named plaintiff in a class action satisfies the charge filing obligation of all members of the class." *Tolliver v. Xerox Corp.,* 918 F.2d 1052·1056 (2d Cir.1990). Therefore, a plaintiff who never filed an EEOC charge may still litigate his or her claim as part of a previously filed law suit so long as those claims fall within the scope of timely filed charges of the named plaintiffs.

Here, the proposed class members' claims all fall with the substantive scope of the timely charges filed by plaintiffs, which alleged age and disability discrimination based on the revocation of retiree health benefits. *See* Dkt. # 29, Exs. CC, DD, EE, FF. In addition, all four plaintiffs timely filed charges naming themselves and "others similarly situated" as the charging parties. Therefore, the EEOC and the Town were alerted of the broad scope of the administrative claim and that those claims affected "a group of individuals defined broadly enough to include those who seek to piggyback on the claim." *Tolliver,* 918 F.2d at 1058. Therefore, there are no procedural impediments to maintaining a collective action.

To maintain a collective action "the named plaintiffs and the proposed members of the class must be 'similarly situated.' Second, the proposed class members must consent in writing to be bound by the result of the suit or 'opt-in.'" *Rodolico v. Unisys Corp.,* 199 F.R.D. 468, 480 (E.D.N.Y.2001). Plaintiffs have not met either of these requirements.

First of all, the plaintiffs and certain members of the proposed class are not similarly situated. Retirees who are 55 to 65 have no ADEA claim. They receive health care coverage under the more favorable Blue Choice Select plan, which coverage plaintiffs concede is similar in nature to the previous Blue Million Plan. Their entitlement to this coverage is not based on age or even retirement status because they receive the same benefits as do all active employees. Unlike the Medicare-eligible retirees, these particular class members have no ADEA claim. While the Court acknowledges that the "similarly situated" requirement for maintaining a collective action is less stringent than the

requirements of Rule 23, *see Rodolico,* 199 F.R.D. at 481, for purposes of the ADEA claim, the proposed class members all have not been the victim of "a single decision, policy or plan infected by discrimination." *Mete v. New York Office of Mental Retardation and Developmental Disabilities,* No. 92–CV–169,1993 WL 226434, *2 (N.D.N.Y. Jun 24, 1993).

Additionally, plaintiffs have not filed the required consents in this case. Section 216(b) of the FLSA provides that a prospective member of the collective action must "opt in" to the action and file a written consent with the Court. Plaintiffs ask this Court to approve use of the opt-out mechanism instead, given the confusion it may cause to send a class notice with both an opt-in and opt-out procedure. Plaintiffs cite no authority for that proposal, and the Court is not inclined to ignore the mandates of the FLSA here. Accordingly, permission to proceed with a collective action on the ADEA claim is denied.

### B. Class Action pursuant to FED. R. CIV. P. 23

Plaintiffs also moved for class action certification. Although generally such determination should be made at an early stage in the case, in light of my decisions here concerning the parties' respective summary judgment motions, I decline to certify the action as a class action at this time. As discussed below, there are several troubling issues that need to be considered by the parties and addressed in subsequent submissions and, perhaps, oral argument.

In order to be certified a class action, a lawsuit must satisfy the prerequisites of FED. R. CIV. PROC. 23(a) and one of the categories of Rule 23(b). Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

In addition, Rule 23(b)(2), pursuant to which plaintiffs here seek class status, allows certification if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

In seeking to certify a class action, the plaintiff bears the burden of establishing that the action satisfies these requirements. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 613–14, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.,* 222 F.3d 52, 58 (2d Cir.2000). In deciding whether to grant class certification, the court must assume the truth of the factual assertions contained in the complaint. *East Texas Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 405, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977); *Medicare Beneficiaries' Defense Fund v. Empire Blue Cross Blue Shield,* 938 F.Supp. 1131, 1139 (E.D.N.Y. 1996). "The Second Circuit has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation." *Jones v. CCH–LIS Legal Information Servs.,* No. 97 CIV. 4372, 1998 WL 671446 at *1 (S.D.N.Y. Sept. 28, 1998) *citing Korn v. Franchard Corp.,* 456 F.2d 1206, 1208–09 (2d Cir.1972); *Green v. Wolf Corp.,* 406 F.2d 291, 298 (2d Cir.1968).

There are several problems with the application for class action certification in light of the present posture of the case. First of all, one of the basic requirements

for class action certification is the so-called numerosity requirement—that is, that the class members are so numerous that joinder of all of them in one action is impractical. I remain unconvinced that plaintiffs have met that burden. It appears that the affected class of retirees consist of about thirty-three members and, apparently most of them are located in the Upstate New York area. Although plaintiffs claim that joinder would be impractical, they have not demonstrated why that would be so.

Courts will often find that the numerosity requirement has been met when the proposed class consists of 40 or more members and has not been met when the class has 21 or less members. *See Ansari v. New York Univ.*, 179 F.R.D. 112, 114 (S.D.N.Y.1998); *see also Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995) (numerosity presumed when a class reaches a level of 40 members).

When a case falls into the "gray area between 21 and 40 class members" courts are required to consider other factors, including the judicial economy that will arise from avoiding multiple actions, the geographic dispersion of members of the proposed class, the financial resources of the class members, the ability of the members to file individual suits, and requests for prospective relief that may have an effect on future class members. *Ansari*, 179 F.R.D. at 114–115 *citing Robidoux v. Celani*, 987 F.2d 931 (2d Cir.1993); 5 James Wm. Moore et al., Moore's Federal Practice, § 23.22[3][a] (3d ed.1997).

In light of the number of potential class members, and the posture of the lawsuit at this time, it does not appear that the class action format is necessary or advisable. Before this issue is resolved conclusively, I believe that the Town should indicate whether or not it would agree to be bound by any decision made by this Court (subject, of course, to its appellate rights) as to all other similarly situated retired employees. It would seem that such a concession by the Town, which is certainly unique, would obviate the need for class action certification and litigation.

There are other concerns which relate to the third and fourth requirements for class certification—typicality of claims or defenses and adequacy of representation—concern me in light of the present posture of the case.

As noted above, the proposed class members between the ages of 55 and 65 do not have an ADEA claim. Based on this Court's decision here, there is a risk that the focus of this case in the future will be on the issues involving the ADEA claim and its equal cost or equal benefit safe harbor. I am concerned that the class members without an ADEA claim will not be fairly represented by the class representatives. *See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990) ("class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation ... [because] there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.") (internal citations omitted). In addition, as discussed above, there may be a conflict of interest between the class members who have an ADEA claim and those who do not. "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods.*, 521 U.S. at 625, 117 S.Ct. 2231. In this regard, plaintiffs may not have satisfied the typicality or adequacy of representation requirements.

I believe that the best course is for the parties to analyze this decision and consider the Court's comments here in view of the claims remaining. It may well be that all parties' interests can be served without the need of class action certification. In this regard, the parties should carefully consider whether plaintiffs have met the additional requirements of Rule 23(b)(2). For example, I am not convinced that plaintiffs here seek primarily injunctive relief. Some plaintiffs in the purported class continue to receive Blue Million benefits and seek only compensation for their payment of the difference in premiums. In sum, all of these issues need to be explored and developed further.

## CONCLUSION

Plaintiffs' motion for summary judgment (Dkt. # 16) is denied in its entirety. Plaintiffs' motion for class certification pursuant to Fed.R.Civ.P. 23 and certification of a collective action pursuant to FLSA § 216 (Dkt. # 14) is denied without prejudice.

The defendants' cross-motion for summary judgment (Dkt. # 29) is granted in part and denied in part. Plaintiffs' first, seventh, ninth, tenth, eleventh, thirteenth, and fourteenth claims, as set forth in plaintiffs' amended complaint, are dismissed with prejudice. However, defendants' motion relating to plaintiffs' second, fourth, fifth, sixth, eighth claims sounding in breach of contract and related equitable theories, as well as plaintiffs' fifteenth claim based on a violation of the ADEA is denied as issues of material fact preclude judgment as a matter of law.

IT IS SO ORDERED.