Donald JACKSON, Plaintiff,

v.

**ROSLYN BOARD OF EDUCATION and the Roslyn Union Free School District, Defendant.**

No. 05 CV 3102(ADS)(MLO).

United States District Court, E.D. New York.

Sept. 3, 2009.

McKenna & Schneier, by Patrick M. McKenna, Esq., of Counsel, Valley Stream, NY, for Plaintiff.

Ingerman Smith, L.L.P., by Warren H. Richmond, III, Esq., of Counsel, Hauppauge, NY, for Defendants.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

Presently before the Court are the parties' cross-motions for summary judgment in lieu of trial on the plaintiff's claim that the defendants' denial of his retirement medical insurance benefits violated his Fourteenth Amendment rights to procedural Due Process. For the following reasons, the plaintiff's motion for summary judgment is denied, the defendants' motion for summary judgment is granted and the complaint is dismissed.

## I. BACKGROUND

*A. Procedural History*

On June 28, 2005, Donald Jackson (the "plaintiff") commenced this action against the Roslyn Board of Education (the "Board"), the Roslyn Union Free School District (the "District") (collectively, the "defendants"), and the Director of the New York State Health Insurance Program in the Employee Benefits Division of the New York State Department of Civil Service. The plaintiff brought this action pursuant to 42 U.S.C. § 1983, alleging that the defendants denied his employee disability retirement medical benefits without adequate notice or a hearing, in violation of the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution.

By Notice of Dismissal dated August 9, 2005, the plaintiff voluntarily dismissed his claims against the New York State Department of Civil Service, leaving only the Roslyn defendants. On June 7, 2006, this Court denied the defendants' motion to dismiss Jackson's procedural Due Process claim, but granted the defendants' motion to dismiss Jackson's Equal Protection claim. In dismissing the plaintiff's Equal Protection claim, the Court found that Jackson failed to allege that he was treated differently than similarly situated individuals. On January 24, 2009, 596 F.Supp.2d 581 (E.D.N.Y.2009), the Court denied plaintiff's motion to amend his complaint to reassert his Equal Protection claim.

The plaintiff previously instituted a civil rights action against the defendants and against then Assistant Superintendent Madalyn McGovern, entitled *Jackson v. Board of Education, et al.,* 02CV3939. On August 20, 2004, the parties entered into a settlement of that action, which settlement specifically excluded the plaintiff's claims for health insurance coverage. The plaintiff expressly reserved the right to pursue a judicial remedy for any damages resulting from the District's failure to furnish the plaintiff with health insurance benefits.

Presently before the Court are the parties' cross-motions for summary judgment. The parties have stipulated to the facts and exhibits in this case, in lieu of a trial.

*B. The Stipulated Facts*

The salient facts with respect to the present motions are as follows.

On or about March 21, 1983, Jackson was hired by the District and subsequently served in the competitive civil service position of Custodian subject to the rules and regulations of the Nassau County Civil Service Commission. (Stipulated Fact ("SF") 7). Jackson entered the New York State Retirement System in 1983. (SF 8). During Jackson's employment with the District, he was a unit member of the Custodial–Bus Drivers and Maintenance Association, and the terms and conditions of his employment were governed by a

written collective bargaining agreement. (SF 9).

In July of 1995, Jackson filed a Worker's Compensation claim after injuring his right elbow on the job, which ultimately resulted in surgery to repair ligament deterioration on April 17, 2002. (SF 10).

In the meantime, on January 3, 2001, Jackson suffered a severe multiple fracture injury to his leg and ankle while on the job, which also necessitated surgery and an extended recuperative period. (SF 11). As a result of that injury, Jackson was on Worker's Compensation leave for approximately seven and one-half months in calendar year 2001 and received a Worker's Compensation Award dated and filed on September 17, 2002. (SF 12).

Jackson returned to work in late August of 2001 and was assigned to "light duty" and remained on "light duty" through the final day that he was permitted to work, April 9, 2002. (SF 13). In or around early February 2002, Jackson filed a number of grievances with his union related to his restricted duty, including a grievance challenging a certain unratified February 5, 2002 "Side Letter of Agreement" between the union and the District precluding workers on light duty from receiving overtime work. Jackson was the only person on light duty at the time. (SF 14).

On or about April 11, 2002, the District lodged "Section 75" charges against Jackson alleging misconduct and insubordination arising out of his alleged sexual harassment of a fellow female employee on February 11, 2002. Jackson was served with the Section 75 charges on or about April 12, 2002 and pursuant to said charges, Jackson was suspended without pay commencing April 12, 2002. (SF 15). The District interrupted the thirty day suspension without pay effective April 17, 2002 through June 12, 2002, while Jackson underwent surgery and recuperation as a result of the 1996 injury to his elbow. (SF 16).

As a consequence of his cumulative work-related injuries, Jackson applied for disability retirement with the New York State and Local Retirement System on or about June 12, 2002. (SF 17). Annmarie Andreas, an Administrative Assistant in the Personnel Office is the person responsible to process and handle all of the employee benefits programs in the District's Personnel Office. (SF 18). Ms. Andreas testified that the New York State Retirement System notifies the District when an application for disability retirement has been made. (SF 19).

Jackson's suspension without pay resumed on June 13, 2002 and continued through and including Friday, July 19, 2002. (SF 21). Jackson's Section 75 disciplinary hearing was held on June 28 and July 15, 2002. (SF 22). At the conclusion of the suspension without pay on July 20, 2002, Jackson was put on involuntary leave with pay as of Monday, July 22, 2002. The District did not permit him to physically return to work and his last day actually working on the job was April 9, 2002. (SF 23).

By a report and recommendation dated August 1, 2002, the District's appointed hearing officer recommended that the Section 75 charges be sustained and that Jackson's employment with the District be terminated. (SF 24). While Jackson's application for disability retirement was pending, on August 8, 2002, the Board adopted the recommendation of the hearing officer and terminated Jackson's employment. (SF 25). Jackson's last day on the District's payroll was August 8, 2002. (SF 26). By letter dated August 13, 3002 and delivered by first class mail, the District gave Jackson notice of his termination effective on August 8, 2002. (SF 27).

Jackson was receiving New York State Health Insurance Plan (N.Y.SHIP or Empire Plan) family coverage benefits at the time of his termination on August 8, 2002 and he continued to receive these benefits through August 31, 2002. (SF 31). A COBRA notice advising Jackson of his right to continue medical benefits at his own expense was sent to Jackson by first class mail on or about September 3, 2002. (SF 32). Jackson elected to be covered under his wife's insurance coverage because he was unable to pay the full cost of the COBRA benefits. (SF 33). Since August 31, 2002, Jackson has had no medical insurance coverage from the New York State Health Insurance Plan.

By letter dated August 29, 2003, the New York State and Local Retirement System notified Jackson and the District that the State Comptroller found that Jackson was entitled to an Article 15 disability retirement because he was "permanently incapacitated for the performance of his duties." (SF 34). By letter dated September 18, 2003, Jackson's disability retirement date was retroactively established as of August 8, 2002, the effective date of his termination and the last day he was on the payroll of the District. (SF 35). On August 8, 2002, the effective date of Jackson's retirement, he was receiving state health benefits. (SF 46).

Ms. Andreas testified that an active employee or a retired employee has the option under the terms of the Collective Bargaining Agreement to elect to enroll in either a HIP Plan or the New York State Health Insurance Plan (the "Empire Plan"). (SF 38). A person who is eligible for retiree health insurance coverage can choose to cancel HIP coverage and subsequently re-enroll in the Empire Plan upon a qualifying event or following a three month waiting period, provided the retiree

had maintained Empire Plan coverage on the date of his or her retirement. (SF 45).

Jackson testified that after he received notice that his disability retirement had been approved in early September 2003, he contacted New York State inquiring about restoring his health insurance benefits and he was told that the District personnel office handles medical benefits for retirees. (SF 56, Exh. F). Jackson further testified that he called Ms. Andreas in September and October of 2003 regarding restoration of health insurance benefits and was advised that she would look into the matter. (SF 57). Ms. Andreas testified that she had at least one telephone conversation in the fall of 2003 with Mr. Jackson, but could not remember when. (SF 59).

Ms. Andreas testified that she recalled telling Jackson that the second page of the August 29, 2003 letter from the New York State and Local Retirement System was only an application for disability retirement and was not disability retirement approval. (SF 60). Ms. Andreas further testified that "The application is not the retirement. The New York State Insurance Plan will not accept [the August 29, 2003 letter]. If I said to them, this person is out, is retired on disability, they will only accept a form with Isabella Currier's signature on it. This is an application. This is not an approval." (SF 62).

Jackson testified that at a December 2003 meeting in the previous civil rights action, then-Assistant Superintendent of Schools Madalyn McGovern told the plaintiff that all he had to do to get his benefits back was to write a letter to Ms. Andreas, "tell her to figure out what five percent of the time you left until now would be, and . . . show there is no break in coverage and you pay the five percent of what the medical cost was to that time and you will be reinstated." (SF 64). Jackson sent a let-

ter to Ms. Andreas on or about January 5, 2004 by certified mail, return receipt requested. (SF 65). The letter was referred to the District's counsel for a response. In a letter dated March 16, 2004, counsel for the District stated:

> During the mediation held in December 2003 at the Federal Courthouse in Central Islip, the issue of medical benefits was briefly discussed. At that mediation, Ms. Madalyn McGovern indicated that, if the State health insurance program permitted Mr. Jackson to receive health insurance benefits as he had requested, he would be obligated to pay 5% of the cost. Ms. McGovern made no representation as to whether Mr. Jackson could participate in the health insurance program or whether he was "entitled to receive benefits . . ." as he claims in his letter.

(SF 66).

On January 9, 2004, Jackson faxed to Ms. Andreas various documents including Exh. G (certain provisions of the collective bargaining agreement), Exh. E (a August 29, 2003 letter from the Disability Processing/Hearing Administration to Ms. McGovern indicating the determination of the state Comptroller on Jackson's disability retirement application), and Exh. F (a letter from the Comptroller's Office to Jackson regarding the terms of his disability retirement). (SF 67). Ms. Andreas testified that she could not recall receiving this information. (SF 68).

Ms. Andreas testified that she requested and received a letter from Ms. Currier by fax on January 16, 2004 indicating that Jackson's retirement became effective on August 8, 2002, and that both Jackson and the District "were notified of disability approval dated August 29, 2003 [and that on] September 18, 2003 correspondence was sent to Mr. Jackson and Roslyn UFSD notifying both of the date of retirement."

(SF 70). Ms. Andreas testified that the January 16, 2004 letter satisfied her that Jackson was actually retired. (SF 71).

Ms. Andreas further testified that she spoke with employees of the New York State Health Insurance Plan to ask them what happens with a disability retirement and that she was told to "rehire, enroll, and then retire the person." She sent the January 16, 2004 letter to Fino Celano, the District's head of Human Resources, with that notation on the page and was awaiting word from him. (SF 72). Ms. Andreas testified that she had subsequent conversations with employees with the New York State Health Insurance Plan discussing Jackson's circumstances and that she was advised that some policies had changed. She further testified that disability retirement eligibility for Empire Plan benefits might depend on whether it was a disability retirement or a worker's compensation disability retirement. (SF 73). Ms. Andreas also testified that she did not send any forms to Mr. Jackson to permit him to enroll for retirement medical benefits because there was no definite decision whether his disability was a straight disability or worker's compensation-type disability. (SF 74). Ms. Andreas further testified that as of October 22, 2004 there still was no resolution as to whether Jackson was entitled to medical benefits. (SF 76).

In August 2004, counsel for the District advised plaintiff's counsel that it was the District's position that Jackson was not entitled to health insurance in retirement because he had earlier been terminated for cause. (SF 77). The parties agree that at no time has the Board of Education ever formally voted to deny Jackson health insurance benefits in retirement. (SF 78).

Ms. Andreas testified that she again requested official documentation from the NYS and Local Retirement Systems on

January 31, 2006 that Jackson was retired, and again received confirmation on the same date that he had retired effective August 8, 2002. She further testified the response did not clarify for her whether he was on a worker's compensation disability retirement. (SF 79).

The parties note that at no time has Jackson commenced a breach of contract action, a declaratory judgment action or an Article 78 proceeding in the New York State courts with respect to his claim of entitlement to health insurance in retirement. (SF 86). This action was commenced on June 28, 2005. (SF 87).

## II. DISCUSSION

### A. The Summary Judgment Standard

Summary judgment is proper only where no genuine issue of material fact exists to present to the trier of fact. Rule 56 of the Federal Rules of Civil Procedure states:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). "This standard applies equally to cases ... in which both parties moved for summary judgment." *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 492 F.3d 89, 96 (2d Cir.2007). "As a result, when parties have filed cross-motions for summary judgment, the court 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Id.* at 96–97 (quoting *Hotel Employees & Rest. Employees Union, Local 100 v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir.

2002)). The same general standard apply where, as here, the parties have stipulated to the relevant facts. *Leebaert v. Harrington*, 332 F.3d 134, 139 (2d Cir.2003).

### B. As to Procedural Due Process

In order to state a valid claim under 42 U.S.C. § 1983, a plaintiff must show that the conduct in question deprived him of a right, privilege, or immunity secured by the Constitution or the laws of the United States, and that the acts were attributable at least in part to a person acting under color of state law. *Washington v. County of Rockland*, 373 F.3d 310, 315 (2d Cir. 2004). It is well-settled that Section 1983 "is not itself a source of substantive rights." *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir.2004) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Instead, Section 1983 provides "a method for vindicating federal rights elsewhere conferred," such as those conferred by the Fourteenth Amendment to the Constitution. *Patterson*, 375 F.3d at 225 (citing *Baker*, 443 U.S. at 144 n. 3, 99 S.Ct. 2689).

The Second Circuit has recognized that "the Due Process Clause does not protect against all deprivations of constitutionally protected interests in life, liberty, or property, 'only against deprivations without due process of law.'" *Rivera–Powell v. New York City Bd. of Elections*, 470 F.3d 458, 464 (2d Cir.2006) (citing *Parratt v. Taylor*, 451 U.S. 527, 537, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)). In order to prevail on a Section 1983 claim for violation of the procedural due process rights guaranteed by the Fourteenth Amendment, the plaintiff must show (1) that he possessed a protected liberty or property interest; and (2) that he was deprived of that interest without due process. *McMenemy v. City of Rochester*, 241 F.3d 279, 285–86 (2d Cir.2001).

■ Further, although the Constitution protects property interests, it does not create them. Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "The Supreme Court has explained that '[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *McMenemy*, 241 F.3d at 286 (quoting *Roth*, 408 U.S. at 577, 92 S.Ct. 2701).

■ Where the property interest is related to employment, courts often look to the relevant law, contract, or regulation governing the employment to determine whether a property interest is protected by the Fourteenth Amendment. *Ciambriello v. County of Nassau*, 292 F.3d 307, 314 (2d Cir.2002); *S & D Maintenance Co. v. Goldin*, 844 F.2d 962, 966 (2d Cir.1988); *see also Perry v. Sindermann*, 408 U.S. 593, 601–02, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). However, "not every contractual benefit rises to the level of a constitutionally protected property interest." *Ezekwo v. N.Y. City Health & Hosps. Corp.*, 940 F.2d 775, 782 (2d Cir.1991). There must be true and legitimate claim of entitlement to the property. *Roth*, 408 U.S. at 577, 92 S.Ct. 2701; *see also Local 342, Long Island Pub. Serv. Employees v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994).

■ The plaintiff raises three sources in support of his claimed property interest in retirement medical insurance benefits. The first and primary source raised by the plaintiff is the collective bargaining agreement between the plaintiff's union and the District. The agreement provides, at Article XX:

1. *Health Insurance:* Effective July 1, 1994, each insurable regular full-time employee who is an active member of the bargaining unit shall be offered by the Board full coverage for self and family under the New York State Government Employees' Health Insurance Program. For all employees who were hired prior to July 1, 2001, the Board shall pay ninety-five (95%) percent of the premium for individual and/or family coverage for each insurable member of the unit and the employee shall contribute five (5%) percent (Section 125 IRC treatment for contribution). Any such employee may have the cost of such coverage applied toward the cost of the HIP Plan instead, should the employee so elect. . . .

. . . .

5. *Retiree's Health Insurance:* Effective July 1, 1994, the Board of Education shall continue to pay one-hundred (100%) percent of the premium for individual or family health insurance for unit members who are currently retired and shall continue to pay one-hundred (100%) percent of the premium for individual or family health insurance for unit members who retire before July 1, 1994 or who submit a request to retire by June 30, 1994 with retirement effective by July 31, 1994. Unit members who retire on or after July 1, 1994 . . . shall contribute to their health insurance premium (individual or family) an amount equal to the same dollar amount of financial contribution that applied to active unit members in the year immediately prior to the employee's retirement. This dollar amount shall remain fixed through the life of the retiree. . . .

The second source raised by the plaintiff is Chapter 729 of the Laws of 1994 (Ch. 729, 1994 N.Y. Laws), as amended by Ch. 43, 2008 N.Y. Laws, S. 6650 (April 7, 2008), which provides that:

[A] school district ... shall be prohibited from diminishing the health insurance benefits provided to retirees and their dependents or the contributions such board or district makes for such health insurance coverage below the level of such benefits or contributions made on behalf of such retirees and their dependents by such district or board unless a corresponding diminution of benefits or contributions is effected from the present level during this period by such district or board from the corresponding group of active employees for such retirees.

Recent comment regarding this legislation provides some guidance with respect to its intended purpose:

In recent years, many public employers have abandoned their long-standing policy of providing health insurance coverage for retirees in an attempt to contain or reduce health insurance costs. There is no statutory requirement that local public employers provide health care coverage to retirees. This allows public employers to unilaterally diminish or even eliminate health insurance benefits to retirees. The Committee strongly believes that protecting retirees from the loss or diminution of health care benefits is essential, even in this time of fiscal constraints.

Chapter 729 of the Laws of 1994 protects school district retirees by prohibiting school districts from reducing health insurance contributions or changes in benefit plans, unless similar changes for active employees are made ....

2008 Annual Report of the New York State Assembly Standing Committee on Government Employees, Dec. 15, 2008 (available at http://assembly.state.ny.us/comm/GovEmp/2008Annual/report.pdf).

The plaintiff cites as a third source of entitlement, N.Y. Civil Service Law § 163(4) (McKinney 1999), which permits school districts to elect to become participating employers under the state health plan "subject to and in accordance with the regulations of the president [of the state civil service commission] relating thereto." According to the plaintiff, the relevant state civil service regulations mandate that a retiree shall continue to have coverage under the state health plan in the event that (1) the retiree has met the District's years of service requirement; or (2) the employee is granted a service-connected disability retirement under the State Retirement System regardless of whether the employee has satisfied the District's years of service requirements. 4 N.Y.C.R.R. §§ 73.2(a)(3)(iv)-(vii) (1997). A closer examination of the section supports this view:

Coverage for any employee and his dependents shall cease without notice on the date of termination of his status as an employee as defined in section 73.1 of this Part. The status of any person as an employee shall be deemed to terminate upon his severance from the payroll, except that, for the purpose of continuing his coverage under the plan, the status of such person as an employee *shall be deemed to continue*

(vii) in the event the employee *is*, or has been, granted a service-connected disability retirement by a retirement or pension plan or system administered and operated by the State of New York or a civil division thereof, including the New York State Teachers' Retirement System, regardless of the employee's service with the employer.

4 N.Y.C.R.R. §§ 73.2(a)(3)(vii) (emphasis added).

Courts have determined that in appropriate circumstances, contractual rights arising from collective bargaining agreement give rise to constitutional property rights. *Ciambriello*, 292 F.3d at 314. In this regard, it has become widely accepted that municipal employees have a constitutional property interest in disability retirement benefits, *i.e.* disability retirement pay. *Russell v. Dunston*, 896 F.2d 664, 669 (2d Cir.1990) (holding that state disability retirement benefits are a constitutionally protected property interest); *Winston v. City of New York*, 759 F.2d 242, 247–49 (2d Cir.1985) (holding that municipal employee retirement benefits are protected); *Basciano v. Herkimer*, 605 F.2d 605, 609 (2d Cir.1978) (holding that employee's interest in accident disability retirement benefits are a constitutionally protected property interest); *Weaver v. New York City Employees' Retirement Sys.*, 717 F.Supp. 1039, 1043 (S.D.N.Y.1989) (same, as to municipal employee retirement benefits). However, no court in this Circuit has directly ruled on whether disability retirement health insurance benefits provided for in collective bargaining agreements are constitutionally protected property.

As a starting point, the Court notes that Second Circuit has explained that

> the Due process Clause is invoked to protect something more than an ordinary contractual right. Rather, procedural protection is sought in connection with a state's revocation of a *status*, an estate within the public sphere characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure, or sometimes both, as frequently occurs in the case of social security benefits.

*S & D Maint.*, 844 F.2d at 966 ("An interest in enforcement of an ordinary commercial contract with a state is qualitatively different from the interests the Supreme Court has thus far viewed as 'property' entitled to procedural due process protection.").

In *Costello v. Fairfield*, 811 F.2d 782 (2d Cir.1987), the Second Circuit found no constitutionally protected property interest in an allegedly contractually mandated increase in municipal retirement benefits. The court distinguished *Basciano* on the basis that Basciano claimed that the procedure to determine whether he was entitled to *any* disability retirement benefit was procedurally deficient, whereas the *Costello* plaintiffs had been receiving their retirement benefits and the dispute was whether the collective bargaining agreement mandated an increase. *Costello*, 811 F.2d at 784 (citing *Basciano*, 605 F.2d 605). The court found that a mere "interpretation of a contract term" could not give rise to a due process claim. *Id.*

In *Bell v. Westmoreland Cent. Sch. Dist.*, No. 87CV1592, 1991 WL 33161 (N.D.N.Y. March 11, 1991), the court found that a former District Superintendent had no property interest in retirement health benefits, stating that post-retirement health insurance benefits did not rise to the level of constitutional interests contemplated by the Supreme Court. *Id.* at *3. The court concluded that it was presented with an ordinary contract dispute. *Id.* at *3–4. However, *Bell* dealt with the employment contract of a singular individual, not rights negotiated as part of a collective bargaining agreement, as in Jackson's case.

In *Lawrence v. Town of Irondequoit*, 246 F.Supp.2d 150 (W.D.N.Y.2002), the plaintiffs, a group of retired individuals, sought relief under the Due Process clause of the Fourteenth Amendment, when their

health insurance benefits were converted to a plan with less desirable benefits. *Id.* at 153. The plaintiffs grounded their claim to a specified medical plan on a municipal personnel manual, which stated that the town would provide retired employees with Blue Cross/Blue Shield coverage, but did not specify which Blue Cross/Blue Shield plan would be provided. *Id.* at 153–54. The court found that the plaintiffs had no constitutionally protected property interest in receiving the more desirable plan, stating that "plaintiffs' interests in receiving a specified level of retirement health care benefits ... 'is qualitatively different from the interests the Supreme Court has thus far viewed as 'property' entitled to procedural due process protection.'" *Id.* at 156–57, 158 (quoting *S & D Maint.*, 844 F.2d at 966). Here, the plaintiff does not seek one type of health coverage over another, rather he has been denied all health coverage.

In *Tucker v. Darien Bd. of Education,* 222 F.Supp.2d 202 (D.Conn.2002), the insured employee, Tucker, was a member of a teachers' union that had entered into a collective bargaining agreement with the defendant, which agreement included medical insurance coverage for teachers and their families. *Id.* at 203. The agreement contained a provision providing that the school board, after consultation with the union, could change medical insurance carriers as long as the level of benefits remained that same. *Id.* Tucker's son suffered from a skeletal deformity of his jaw, which required extensive orthodontia to be followed by surgery. *Id.* Tucker called his health benefits administrator before starting his son on preparatory orthodontia and received written confirmation that the surgery would be covered. *Id.* However, before the surgery took place, the defendant school board changed medical providers and Tucker was informed by the new provider that his son's surgery would not be covered. *Id.*

After pursuing the internal administrative procedures with the insurance provider, the plaintiff filed suit in federal court alleging, among other things, that the denial of the surgical benefit amounted to a deprivation of a property interest without due process of law. *Id.* The court framed the issue as "whether the [recognition of property interests arising out of public employment] includes a particular medical benefit owed to a public employee under a collective bargaining agreement." *Id.* at 204. The court held that although medical benefits could be constitutionally protected property in some instances, "coverage of particular medical procedures and specific health benefits in private medical plans, even when those plans are incorporated into public collective bargaining agreements, do not rise to the level of 'extreme dependence' so as to be subject to due process protection." *Id.* at 206.

Here, Jackson has received no health insurance benefits, rather than a specific type of health insurance as in *Lawrence* or coverage of a particular procedure as in *Tucker.* Given the costs associated with medical care and self-insurance, an individual can certainly be dependant on the health insurance provided by their employer. This dependence can be even more pronounced in the case of retired persons. Improper denial of *all* health insurance coverage can have nearly the same crippling effects as the denial of welfare or social security disability benefits. *See S & D Maint.,* 844 F.2d at 966.

Further, Jackson's entitlement to such coverage is supported by the provisions of the collective bargaining agreement. The sections of the collective bargaining agreement submitted in evidence make no exception for employees receiving disability retirement or those who might have been

terminated and later awarded retirement pay. Jackson was eligible for disability retirement on the basis of his work-related injury and years of contribution to the State Retirement System. Jackson's disability retirement status was granted by the State Retirement System for all purposes, with no exclusions. The defendants fail to provide legal support for their contention that Jackson's disciplinary dismissal terminated his right to disability retirement medical insurance benefits.

[5] Finally, in light of statutory protections afforded to retirees of the State, the Court finds that Jackson has a constitutionally protected property interest in health insurance benefits. Accordingly, the Court will now determine whether Jackson was deprived of this property interest without due process of law.

[6] Due process ordinarily requires that persons receive "some kind of hearing" prior to the deprivation of a property interest. *See Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 299, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); *Velez v. Levy*, 401 F.3d 75, 91–92 (2d Cir.2005); *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir.2003); *Dwyer v. Regan*, 777 F.2d 825, 832 (2d Cir.1985); *Burtnieks v. City of New York*, 716 F.2d 982, 988 (2d Cir.1983).

[7] "[I]n evaluating what process satisfies the Due Process Clause, 'the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees.'" *Rivera–Powell*, 470 F.3d at 465 (citing *Hudson v. Palmer*, 468 U.S. 517, 532, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) and *Parratt*, 451 U.S. at 537, 101 S.Ct. 1908). Where the plaintiff alleges a deprivation pursuant to an established state procedure, "the state can predict when it will occur and is in the position to provide a predeprivation hear-

ing." In such instances, "the availability of post-deprivation procedures will not, *ipso facto*, satisfy due process." *Rivera–Powell*, 470 F.3d at 465 (citing *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996)).

[8] On the other hand, if the deprivation occurs at the hands of a government actor by way of a "random and unauthorized act," the constitutional protection of due process does not require a pre-deprivation hearing, so long as there is an adequate post-deprivation procedure available to address the alleged violation. *Hellenic Am.*, 101 F.3d at 880–82; *see also Zinermon v. Burch*, 494 U.S. 113, 132, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (explaining that where the state is effectively "unable to anticipate and prevent a random deprivation of a liberty interest, post deprivation remedies might satisfy due process").

As noted previously in this case, the Second Circuit has clearly explained the reasons behind distinguishing between "established" state procedures and "random and unauthorized acts":

The Supreme Court's different treatment of the two situations rests on pragmatic considerations.... When a deprivation occurs because of a random, arbitrary act by a state employee "[i]t is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place. The loss of property, although attributable to the State as action under 'color of law,' is ... almost ... [invariably] beyond the control of the State. Indeed, in most cases it is not only impracticable, but impossible, to provide a meaningful hearing before the deprivation."

*Hellenic Am.*, 101 F.3d at 880–81 (internal citations omitted);

■ Accordingly, "[w]here a pre-deprivation hearing is impractical and a post-deprivation hearing is meaningful, the State satisfies its constitutional obligations by providing the latter." *Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir.1984) (finding no due process violation where plaintiff alleged that his resignation as school principal was coerced because "it is hard to visualize what sort of prior hearing the Constitution would require the employer to conduct"); *see also Parratt*, 451 U.S. at 540–41, 101 S.Ct. 1908 (rejecting the proposition that opportunity to be heard 'at a meaningful time and in a meaningful manner' always requires a pre-deprivation hearing based on the impracticability in some cases of providing any pre-seizure hearing, and the assumption that at some time a full and meaningful hearing will be available).

In a previous decision denying defendants' motion to dismiss Jackson's complaint, the Court noted that:

> Despite the defendants' urging, at this point the Court cannot say with any degree of certainty whether the defendants' act of merely refusing to entertain the plaintiff's application occurred within the contexts of established state procedures or it was a random and unauthorized act of the type discussed in *Hellenic*.

> While it may be a reasonable assumption that the defendants received applications of the type submitted by the plaintiff with some frequency, it is not yet known. There is nothing in the pleadings to indicate what procedures the defendants or the State had in place concerning the filing of such applications; the routine processing of those applications; and the frequency with which the defendants actually refuse benefits to those applicants who claim

they have had their eligibility determined by the state.

> In the Court's view, under these circumstances we must await the presentation of the evidence to establish whether the scenario that the plaintiff found himself in is common; whether the defendants were or should have been aware of the situation; and ultimately whether the defendant should have, or even could have, provided the plaintiff with any form of pre-deprivation process. . . .

*Jackson v. Roslyn Bd. of Education*, 438 F.Supp.2d 49, 54–55 (E.D.N.Y.2006).

Jackson was granted his disability retirement from the State and has been collecting disability retirement payments. The only issue between the parties is whether Jackson is entitled to receive health insurance benefits as a retiree from the District. The parties have now stipulated to the fact that Jackson's request for such benefits was the first instance in which an individual employee had been terminated for cause and subsequently granted disability retirement retroactive to his last day of work. (SF 90).

The defendants' decision to terminate Jackson's medical benefits (as well as his employment) for cause came before Jackson was granted disability retirement status. Thus, when Jackson was granted disability retirement, his medical benefits had already ceased and he was already "deprived." Accordingly, what the plaintiff seeks is reinstatement of his previously terminated benefits. Under these circumstances, pre-deprivation process would have been wholly impractical, if not impossible.

Further, at the time Jackson's medical benefits were actually removed, his employment had been terminated for cause. There is *no* dispute that the plaintiff received adequate notice and an opportunity to be heard with respect to the disciplinary

termination proceedings. At that time, it was not known to the District and the Board that Jackson would be granted disability retirement and thus be entitled to continued medical benefits. Accordingly, an additional pre-deprivation proceeding was not available.

The question, then, is whether adequate post-deprivation remedies were available to Jackson. The Second Circuit has held that an Article 78 proceeding under New York law affords sufficient post-deprivation constitutional process where pre-deprivation process is impracticable. *See Hellenic Am.*, 101 F.3d at 881–82; *see also Gudema v. Nassau County*, 163 F.3d 717, 724–25 (2d Cir.1998). "Article 78 of the New York Civil Practice Law [is] an amalgam of the common law writs of certiorari to review, mandamus, and prohibition...." *Hellenic Am.*, 101 F.3d at 881. An Article 78 proceeding provides the opportunity to review whether a body or officer "failed to perform a duty enjoined upon it by law" or whether a specific act was "made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion," N.Y. C.P.L.R. 7803, and permits the state court to remedy the violation by ordering a hearing or a return of the unlawfully seized property. *Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 156–57 (2d Cir.2006). Had Jackson commenced an Article 78 proceeding, the state court could have determined his entitlement to medical benefits, "avoiding the constitutional thicket," and could have ordered such reinstatement as was deemed appropriate. *See Giglio*, 732 F.2d at 1134.

Finally, it is conceivable that the letter from defendants' counsel in August of 2004, relaying the determination that the plaintiff was ineligible for health insurance benefits, could give rise to a Due Process claim if it failed to notify the plaintiff of the basis for this determination or failed to provide the plaintiff with adequate information regarding his right to contest the determination. *See Ortiz v. Regan*, 749 F.Supp. 1254, 1263 (S.D.N.Y.1990). However, the plaintiff has failed to present that letter as evidence either in support of his own motion or in opposition to the defendants' motion. Accordingly, the plaintiff has failed to adduce sufficient evidence to withstand the defendants' motion for summary judgment.

## III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED,** that the plaintiff's motion for summary judgment on stipulated facts in lieu of trial is denied; and it is further

**ORDERED,** that the defendants' motion for summary judgment on stipulated facts in lieu of trial is granted and the complaint is dismissed; and it is further

**ORDERED,** that the Clerk of the Court is directed to enter judgment in favor of the defendants and close the case.

**SO ORDERED.**